**MURPHY MOTOR FREIGHT LINES, Inc., a Minnesota corporation, and Witte Transportation Company, a Minnesota corporation, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**Monson Dray Line, Inc., Intervening Defendant.**

Civ. No. 2815.

United States District Court
D. Minnesota, Third Division.
Feb. 25, 1957.

Perry R. Moore and Mackall, Crounse, Moore, Helmey & Palmer, Minneapolis, Minn., for plaintiffs.

George E. MacKinnon, U. S. Atty., Kenneth G. Owens, Asst. U. S. Atty., St. Paul, Minn., and James Y. Piper, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendants.

F. J. O'Brien, Rochester, Minn., and D. D. Wozniak, St. Paul, Minn., for intervening defendant.

Before SANBORN, Circuit Judge, NORDBYE, Chief Judge, and DONOVAN, District Judge.

PER CURIAM.

Murphy Motor Freight Lines, Inc., (Murphy) and Witte Transportation Company (Witte) are Minnesota corporations and common carriers by motor vehicle. They brought this action to set aside: (1) a certificate of public convenience and necessity issued by the Interstate Commerce Commission (Commission) on September 22, 1953, in what the parties refer to as "Monson's Docket No. MC–4483, Sub 5," to Monson Dray Line, Inc. (Monson), a Minnesota corporation, a common carrier by motor vehicle; and (2) an order of the Commission of March 21, 1955, entered in the same proceeding, denying a petition filed on December 27, 1954, by Murphy and Witte, requesting a waiver by the Commission of its General Rule of Practice 101(e), 49 U.S.C.A. following section 1185, for the purpose of having the Monson proceeding reopened and set for hearing.

The certificate of the Commission, of which the plaintiffs complain, enables Monson to carry shipments originating in the Twin Cities (Minneapolis and St. Paul, Minnesota,) consigned to Faribault, Minnesota, or Rochester, Minnesota, over a route from the Twin Cities to Red Wing, Minnesota, which passes

through Wisconsin, and thus has the effect of transmuting what would otherwise constitute intrastate traffic—which Monson could not transport to Faribault and Rochester without authority from the Minnesota Railroad and Warehouse Commission (Minnesota Commission)—into interstate shipments, which Monson can transport between those points as interstate traffic because of authority granted by the Interstate Commerce Commission.

Monson did not, and does not, have authority from the Minnesota Commission for the intrastate transportation of commodities between the Twin Cities and Faribault or Rochester. Murphy had, and has, general commodity regular route authority, both interstate and intrastate, between the Twin Cities and Faribault and between the Twin Cities and Red Wing over routes within Minnesota. Witte had, and has, similar authority, both interstate and intrastate, between the Twin Cities and Rochester and between the Twin Cities and Red Wing.

Before the issuance on September 22, 1953, by the Commission of the certificate to Monson, Monson could not transport any intrastate traffic between the Twin Cities and Faribault or Rochester. The issuance of the certificate to Monson put it in a position to compete directly with Murphy and Witte for such traffic by using the Wisconsin route to Red Wing and combining that with Monson's other interstate authority. The plaintiffs assert that this was done deliberately by Monson to avoid or evade regulation by the Minnesota Commission.

The plaintiffs, concededly, had no actual notice of Monson's application for the certificate of September 22, 1953. They were afforded no opportunity to be heard in opposition. The evidence indicates that the plaintiffs had no notice or knowledge of the issuance of the certificate prior to November 17, 1953, which was approximately fifty-five days after the certificate had been issued. The 30-day period provided by Rule 101 (e) of the Commission's General Rules of

Practice, for seeking a reopening of such a proceeding, had expired. There was then no way in which the plaintiffs could secure a reopening of the proceeding unless the Commission was willing to waive its rule. However, the plaintiffs did not promptly move for a waiver of the rule, but on December 27, 1954, filed a petition "to waive Rule 101(e) and request for leave to file a petition to set aside or revoke a certificate, reopen and set the subject matter for hearing." On March 21, 1955, by order of the Commission, "said request for waiver of Rule 101(e) of the General Rules of Practice" was "denied, for the reason that such action is not warranted."

When Monson filed its application for the certificate of public convenience and necessity with the Commission on October 9, 1952, Monson was a direct competitor of the plaintiffs at Red Wing, Minnesota. There is no doubt that, as interested parties, the plaintiffs were entitled to reasonable notice of the application and to an opportunity to be heard.

The applicable statutes respecting notice are Section 306(b), Title 49 U.S.C. A., which provides:

"Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form and contain such information and be accompanied by proof of service upon such interested parties as the Commission shall, by regulation, require. * * * "

and Section 305(e), Title 49 U.S.C.A., which provides:

"In accordance with rules prescribed by the Commission, reasonable notice shall be afforded, in connection with any proceeding under this chapter, to interested parties and to the board of any State, or to the governor if there be no board, in which the motor carrier operations involved in the proceeding are or are proposed to be conducted, and opportunity for intervention in any such proceeding for the purpose of

making representations to the Commission or for participating in a hearing, if a hearing is held, shall be afforded to all interested parties."

In addition, there was in effect a regulation of the Commission, published April 26, 1951, 49 C.F.R. § 168.1(b), 16 F.R. 3587, which contained the following:

"* * * A notice of the filing of such application, Form BMC 15 (Revised) (§ 7.15), must also be delivered, in person or by registered or receipted mail, to each motor carrier and each carrier by rail or water, known to the applicant, with whose service the operations described in such application are or will be directly competitive."

The application form BMC–78, 49 C.F.R. § 7.78, 16 F.R. 3587, published April 26, 1951, provided that the applicant should sign a Certificate of Service thereon, showing that

"A notice of the filing of this application, Form BMC 15 (Revised), has been delivered, in person or by registered or receipted mail, to the following carriers by motor vehicle, rail, or water, known to the applicant, with whose service the operations described in this application are or will be directly competitive (applicant should make diligent inquiries, including, among other places the appropriate field offices of the Commission's Bureau of Motor Carriers, to determine the name of every motor carrier, railroad, or water carrier with whose service the operations described in this application are or will be competitive)."

It is apparent that Monson failed to make diligent inquiry as to the names of carriers whose services would be directly competitive with the operations described in its application. It appears that Edward J. McMonigal, Traffic Manager for the Monson Dray Line, did visit the Commission's field office in Minneapolis and obtained from a Mr. Ganley there a list of carriers upon whom service should be made. But an examination of that list would indicate that Mr. Ganley assumed that the competitive carriers would be the few which served the particular area in Wisconsin over U. S. Highways 10 and 63 over which Monson sought to obtain rights in connecting its operations in the Twin Cities with those in southeastern Minnesota. This seems evident when the list of the competitors is examined and they are found to be the Chicago, Burlington and Quincy Railroad, which serves Diamond Bluff and Hager City, Wisconsin; Funk Bros., Bay City, Wisconsin; C. W. Murphy, Hager City, Wisconsin; Wayne Steel, Maiden Rock, Wisconsin; and Glendenning Motorways, St. Paul, Minnesota. Monson knew that Murphy and Witte were in direct competition with it at Red Wing, and, moreover, knew that if its application was granted it would utilize the route through Wisconsin in order to be able to carry intrastate shipments from the Twin Cities to Rochester and Faribault. It seems apparent that Monson wholly failed to make any diligent inquiries in order to determine the name of every motor carrier with whose service the operations described in its application would be competitive. A mere inquiry from the party in charge of the Minneapolis field office in that regard did not relieve Monson from the mandate of the statute, and if the field office had been advised by Monson that under the Wisconsin route it would be able to operate in direct competition with the plaintiffs in making intrastate hauls from the Twin Cities to Rochester and Faribault, it seems inconceivable that the Commission would have limited its list to those indicated above. It is not necessary for us to determine what constitutes diligent inquiry by one who files an application with the Commission for authority to expand the applicant's operations as a common carrier. Suffice it to say that, under the undisputed facts herein, the plaintiffs were parties known to the applicant to be carriers "with whose service the operations described in" its "application would be directly competitive."

But although we are of the opinion that adequate notice was not given to the plaintiffs in compliance with the statute which required reasonable notice to all interested parties, we are not requested to stay or interfere with Monson's activities under the certificate which has been issued. Our inquiry is limited to whether the Commission, in view of Monson's failure to give reasonable notice, and in view of the exceptional facts which were made to appear at the time the plaintiffs filed their application for waiver of Rule 101(e), abused its discretion and acted arbitrarily in failing to afford the plaintiffs a hearing. We are not unmindful that, in determining whether the Commission's rule for reopening should be waived, we must recognize that this question is one which is primarily addressed to the discretion of the Commission, and it is only in a case where there are exceptional facts that a reviewing court will interfere. However, the failure to give notice to the plaintiffs deprived the Commission of an opportunity to be advised of all the relevant facts, and it would seem that that circumstance is a persuasive factor in determining the necessity for a rehearing. The very evident purpose of the statute requiring notice is to enable the Commission to be informed as to the public need and necessity of the commodity route applied for by an applicant, and, without reasonable notice to interested parties, that phase of the inquiry may remain unexplored at the hearing. The defendants admit in their brief that if the plaintiffs had made a timely application for a waiver of Rule 101(e), they would have been able to make a persuasive showing for a waiver of the rule. But the defendants' position is that the long delay amounts to laches and therefore the plaintiffs' application to this Court for relief should be denied. Our primary problem, therefore, with respect to whether or not the Commission should have waived its rule arises from the delay that took place between November 17, 1953, when the plaintiffs learned of the issuance of the certificate to Monson, and December 27, 1954, when they filed their application for a waiver with the Commission.

As soon as the plaintiffs were informed of the issuance of the Monson certificate, they took the position that the jurisdiction of the State Commission had been usurped or circumvented by granting to Monson the so-called Wisconsin route. The plaintiffs sought the aid of the State Commission to obtain relief. Apparently the State Commission did intercede, and it is significant that Monson promised on three different occasions between November, 1953, and June, 1954, that its operations at Rochester and Faribault in handling intrastate traffic would cease. On December 29, 1953, the President of Monson Dray Line, Inc., wrote to the Chairman of the Minnesota Railroad and Warehouse Commission in part as follows:

"After due deliberation, I have decided to presently abandon any attempts to haul commodities from the Twin Cities to Rochester, Minnesota, by way of Hager City, Wisconsin, or any Wisconsin points. In the event I should decide at some future date to begin such operation, I will give ample notice to the Commission and to the Witte Transportation Company in order that the rights of all parties may be protected."

Apparently, however, after resuming activities, that is, transporting Twin Cities origin freight to Rochester and Faribault, and after a conference with the State Commission, Monson again on April 12, 1954, wrote as follows:

"Relative to our letters of December 29, 1953, and March 29, 1954, to Commissioner Paul Rasmussen and pursuant to a conference with the full Commission at 2:30 P.M. on April 8, 1954, at which the undersigned, Edw. J. McMonigal, our Traffic Manager, and Thomas Walsh, our attorney, were present, we hereby notify the Commission as follows:

"The Monson Dray Line, Inc., will not haul any freight (except beer) moving between points in Minnesota over our interstate route in Wisconsin, namely, between Junction of U. S. Highway 10 and U. S. Highway 61 (north of Hastings) to Red Wing, Minnesota, over U. S. Highway 10 to junction of U. S. Highway 63, thence over U. S. Highway 63 into Red Wing, Minnesota, until further notice is given to the Commission."

Moreover, it appears that during the summer and fall of 1954, Monson had a petition before the State Commission seeking authority to haul Twin Cities origin freight to Rochester and Faribault. That petition was not dismissed until November 16, 1954. When Monson finally resumed its operations under the certificate issued by the Interstate Commerce Commission, after the discontinuances to which references have been made, Monson was aware that the plaintiffs were contesting its resumption of intrastate hauling between the Twin Cities and Rochester or Faribault. In addition, it seems clear that by its own conduct Monson contributed to the delay which ensued before the plaintiffs applied for a waiver of Rule 101(e). Since it appears that the plaintiffs were deprived of reasonable notice, as required by the Interstate Commerce Act, of Monson's application by reason of Monson's neglect to comply with the applicable law, and since it appears that Monson must have known that its proposed service would be directly competitive with that of the plaintiffs, the mere lapse of time during which the parties were apparently attempting to adjust the dispute among themselves with the aid of the Minnesota Commission, should not deprive the plaintiffs of their statutory right to be heard before the Interstate Commerce Commission on the merits of Monson's application.

After due consideration, we are of the opinion that the doctrine of laches is not applicable, in view of the unusual and exceptional circumstances which occasioned the delay of which complaint now is made.

We conclude that, in view of the exceptional facts and circumstances disclosed, the Commission abused its discretion and acted arbitrarily in denying plaintiffs' application to waive Rule 101 (e). We therefore remand the proceeding known as Monson's Docket No. MC-4483, Sub 5, to the Interstate Commerce Commission for a rehearing in which all the interested parties, including the plaintiffs, may be afforded an opportunity to be heard.